UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

STEPHEN G. BARONE,

                              Plaintiff,

                   -vs-                                    13-CV-896-JTC

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

_____

APPEARANCES:   BERNHARDI & LUKASIK PLLC (WILLIAM C. BERNHARDI and
               SARAH A. FREDERICK, of Counsel), West Seneca, New York, for
               Plaintiff

               WILLIAM J. HOCHUL, JR., United States Attorney (DANIEL ROBERT
               JANES, Special Assistant United States Attorney, of Counsel),
               Buffalo, New York, for Defendant.

       This matter has been transferred to the undersigned for all further proceedings, by

order of Chief United States District Judge William M. Skretny dated December 15, 2014

(Item 19).

       Plaintiff Stephen G. Barone initiated this action on September 4, 2013, pursuant to

the Social Security Act, 42 U.S.C. § 405(g) ("the Act"), for judicial review of the final

determination of the Commissioner of Social Security ("Commissioner") denying plaintiff's

application for Social Security Disability Insurance ("SSDI") and Supplemental Security

Income ("SSI") benefits under Title II and Title XVI of the Act, respectively.  Both parties

have moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure (see Items 11, 14).  For the following reasons, plaintiff's motion is granted,

and the Commissioner's motion is denied.

## BACKGROUND

Plaintiff was born on December 12, 1958 (Tr. 162).[1]  He filed applications for SSDI and SSI benefits on December 3, 2009, alleging disability due to postherpetic neuralgia ("PHN"),[2] herpes zoster (shingles),[3] and status post gunshot wound, with an onset date of January 10, 2003 (Tr. 162-67, 181).   The applications were denied administratively on March 10, 2010 (Tr. 72-87).  Plaintiff requested a hearing, which was held on October 13, 2012, before Administrative Law Judge ("ALJ") Timothy M. McGuan (Tr. 28-55).  Plaintiff appeared and testified at the hearing, and was represented by counsel.  Vocational expert ("VE") Jay Steinbrenner also appeared and testified.

On March 14, 2012, the ALJ issued a decision finding that plaintiff was not disabled within the meaning of the Act (Tr. 10-24).  Following the sequential evaluation process outlined in the Social Security Administration regulations governing claims for benefits

---

[1]Parenthetical numeric references preceded by "Tr." are to pages of the administrative transcript filed by the Commissioner at the time of entry of notice of appearance in this action (Item 6).

[2]"Postherpetic neuralgia" is defined as:

… a complication of shingles, which is caused by the chickenpox (herpes zoster) virus.  Most cases of shingles clear up within a few weeks.  But if the pain lasts long after the shingles rash and blisters have disappeared, it's called postherpetic neuralgia.

Postherpetic neuralgia affects your nerve fibers and skin, and the burning pain associated with postherpetic neuralgia can be severe enough to interfere with sleep and appetite.  The risk of postherpetic neuralgia increases with age, primarily affecting people older than 60. …

Currently, there's no cure for postherpetic neuralgia, but there are treatment options to ease symptoms. For most people, postherpetic neuralgia improves over time.

http://www.mayoclinic.org/diseases-conditions/postherpetic-neuralgia/basics/definition/con-20023743

[3]Herpes zoster is caused by the same virus that causes chickenpox.  *Merck Manual of Diagnosis and Therapy* 1294 (17th ed.1999), *cited in Samuels v. Barnhart*, 2003 WL 21108321, at *2 n. 4 (S.D.N.Y. May 14, 2003).  According to the *Merck Manual*, "[h]erpes zoster frequently occurs in HIV-infected patients and is more severe in immunosuppressed patients."  *Id.* at 1294.

under Titles II and XVI (*see* 20 C.F.R. §§ 404.1520, 416.920), the ALJ found that plaintiff's impairments, including "severe" status post gunshot wound and PHN, and "non-severe" shingles and human immunodeficiency virus ("HIV") infection, considered alone or in combination, did not meet or medically equal the criteria of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings") (Tr. 15-16).  The ALJ discussed the evidence in the record regarding the functional limitations caused by plaintiff's impairments, including the objective medical evidence and plaintiff's testimony and written statements about his symptoms, and determined that plaintiff had the residual functional capacity ("RFC") to perform work at the "light"[4] exertional level, with the option to sit or stand after 45 minutes (Tr. 16-22).  Relying on the VE's testimony indicating that an individual of plaintiff's age, education, work experience, and RFC would be able to perform the physical and mental demands of plaintiff's past relevant work as a systems analyst, and alternatively, would be capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and using Rules 202.21 and 202.14 of the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids") as a framework for decision-making, the ALJ determined that plaintiff had not been disabled within the meaning of the Act at any time since the alleged onset date (Tr. 22-24).

---

[4]"Light work" is defined in the regulations as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567, 416.967.

The ALJ's decision became the final decision of the Commissioner on July 16, 2013, when the Appeals Council denied plaintiff's request for review (Tr. 1-3), and this action followed.

In his motion for judgment on the pleadings, plaintiff contends that the Commissioner's determination should be reversed because the ALJ failed to properly assess the severity of plaintiff's HIV infection and herpes zoster impairments, failed to properly assess plaintiff's RFC, and improperly relied on the VE's testimony.  *See* Items 14-1, 17, 18).  The government contends that the Commissioner's determination should be affirmed because the ALJ's decision was made in accordance with the pertinent legal standards and is based on substantial evidence.  *See* Items 12-1, 16.

## **DISCUSSION**

## I.    **Scope of Judicial Review**

The Social Security Act provides that, upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive …."   42 U.S.C.  §  405(g). Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion."  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Tejada v. Apfel*, 167 F.3d 770, 773-74 (2d Cir. 1999).  The substantial evidence test applies not only to findings on basic evidentiary facts, but also to inferences and conclusions drawn from the facts.  *Giannasca v. Astrue*, 2011 WL 4445141, at *3 (S.D.N.Y. Sept. 26, 2011) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)).

Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try the case *de novo* or substitute its findings for those of the Commissioner. *Richardson*, 402 U.S. at 401; *see also Cage v. Comm'r of Soc. Servs.*, 692 F.3d 118, 122 (2d Cir. 2012). The court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982), *quoted in Hart v. Colvin*, 2014 WL 916747, at *2 (W.D.N.Y. Mar. 10, 2014).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in the light of correct legal standards." *Klofta v. Mathews*, 418 F. Supp. 1139, 1411 (E.D.Wis. 1976), *quoted in Sharbaugh v. Apfel*, 2000 WL 575632, at *2 (W.D.N.Y. Mar. 20, 2000); *Nunez v. Astrue*, 2013 WL 3753421, at *6 (S.D.N.Y. July 17, 2013) (citing *Tejada*, 167 F.3d at 773). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (citations omitted). Thus, the Commissioner's determination cannot be upheld when it is based on an erroneous view of the law, or misapplication of the regulations, that disregards highly probative evidence. *See Grey v. Heckler*, 721 F.2d 41, 44 (2d Cir. 1983); *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987) ("Failure to apply the correct legal standards is grounds for reversal."), *quoted in McKinzie v. Astrue*, 2010 WL 276740, at *6 (W.D.N.Y. Jan. 20, 2010).

If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision. 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall review only the question of conformity with [the] regulations…."); *see Kohler*, 546 F.3d at 265.  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it.  *See Marquez v. Colvin*, 2013 WL 5568718, at *7 (S.D.N.Y. Oct. 9, 2013) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides)).

In addition, it is the function of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant." *Carroll v. Sec'y of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983); *cf. Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. Sept. 5, 2013).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve," *Veino*, 312 F.3d at 588, and the court "must show special deference" to credibility determinations made by the ALJ, "who had the opportunity to observe the witnesses' demeanor" while testifying.  *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994).

## II.    Standards for Determining Eligibility for Disability Benefits

To be eligible for SSDI or SSI benefits under the Social Security Act, plaintiff must present proof sufficient to show that he suffers from a medically determinable physical or

mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months …," 42 U.S.C. § 423(d)(1)(A), and is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy …." 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). As indicated above, the regulations set forth a five-step process to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for benefits. *See* 20 C.F.R. §§ 404.1520, 416.920. First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity. If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that has lasted (or may be expected to last) for a continuous period of at least 12 months which "significantly limits [the claimant's] physical or mental ability to do basic work activities …." 20 C.F.R. §§ 404.1520(c), 416.920(c); *see also* §§ 404.1509, 416.909 (duration requirement). If the claimant's impairment is severe and of qualifying duration, the ALJ then determines whether it meets or equals the criteria of an impairment found in the Listings. If the impairment meets or equals a listed impairment, the claimant will be found to be disabled. If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant has the residual functional capacity to perform his or her past relevant work. If the claimant has the RFC to perform his or her past relevant work, the claimant will be found to be not disabled, and the sequential evaluation process comes to an end. Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ

determine whether the claimant is capable of performing any work which exists in the national economy, considering the claimant's age, education, past work experience, and RFC.  *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Lynch v. Astrue*, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008).

The claimant bears the burden of proof with respect to the first four steps of the analysis.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  If the claimant meets this burden, the burden shifts to the Commissioner to show that there exists work in the national economy that the claimant can perform.  *Lynch*, 2008 WL 3413899, at *3 (citing *Rosa*, 168 F.3d at 77).  "In the ordinary case, the Commissioner meets h[er] burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), … [which] take into account the claimant's residual functional capacity in conjunction with the claimant's age, education, and work experience."  *Rosa*, 168 F.3d at 78 (internal quotation marks, alterations and citations omitted).  If, however, a claimant has non-exertional limitations (which are not accounted for in the grids) that "significantly limit the range of work permitted by his exertional limitations then the grids obviously will not accurately determine disability status …."  *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986) (internal quotation marks and citation omitted).  In such cases, "the Commissioner must 'introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the national economy which claimant can obtain and perform.' "  *Rosa*, 168 F.3d at 78 (quoting *Bapp*, 802 F.2d at 603).

**III.     The ALJ's Disability Determination**

In this case, ALJ McGuan determined at step one of the sequential evaluation that plaintiff had not engaged in substantial gainful activity since January 10, 2003, the alleged onset date (Tr. 15).  At step two, the ALJ determined that plaintiff's status post gunshot wound and PHN were "severe" impairments within the meaning of the regulations because they caused significant limitations in plaintiff's ability to perform basic work activities (Tr. 15).  The ALJ also found that plaintiff's herpes zoster was not a severe impairment because the episodes recurred intermittently and did not meet the twelve-month duration requirement, and that plaintiff's HIV positive status was not a severe impairment because the diagnosis was recent and there was no accompanying evidence of AIDS or other HIV symptomatology (Tr. 15-16).  At step three, the ALJ found that plaintiff's impairments, considered alone or in combination, did not meet or equal the severity of a listed impairment, with specific reference to the criteria of Listings 14.08 (*Human immunodeficiency virus (HIV) infection*) (D)(3)(a) (Herpes zoster: Disseminated) and (b) (With multidermatomal eruptions that are resistant to treatment); 8.05 (*Dermatitis*); and 8.04 (*Chronic infections of the skin or mucous membranes*) (Tr. 16).

The ALJ then found that plaintiff retained the RFC to perform light work, except that he required the option to sit or stand after 45 minutes, and could frequently crawl, squat, and climb (Tr. 16).  In making this assessment, the ALJ discussed plaintiff's testimony and statements in his written submissions regarding the limiting effects of his pain and other symptoms, along with the objective medical evidence and the opinions of treating, examining, and reviewing physicians (Tr. 16-22).  At step four, upon comparing plaintiff's

RFC for light work with the physical demands of his former job as a systems analyst–which the VE described as "skilled … sedentary work" (Tr. 51)–the ALJ found that plaintiff would be capable of performing his past relevant work (Tr. 22).  Alternatively, at step five the ALJ considered the testimony of the VE regarding the extent to which a person of plaintiff's age (44 at the time of alleged onset), with similar education (at least high school), work experience, and functional limitations could make a successful adjustment to other work existing in the national economy (Tr. 23).  Based on the VE's testimony, the ALJ found that there are a significant number of jobs that plaintiff could perform, and that a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rules 202.21 and 202.14 (Tr. 23-24).

## IV.    Plaintiff's Motion

In support of his motion for judgment on the pleadings, plaintiff primarily contends that the Commissioner's determination should be reversed because the ALJ failed, at step two of the sequential evaluation, to properly assess the severity of plaintiff's HIV infection and recurrent shingles, and at step three, to properly assess whether these impairments satisfied the requirements of the Listings.  Plaintiff also contends that the ALJ failed to discharge his affirmative duty to further develop the record by, among other things, recontacting plaintiff's treating medical sources for their opinions with respect to the nature and severity of these impairments.

As already indicated, the ALJ found that the medical evidence established plaintiff's history of recurrent episodes of herpes zoster, but the impairment was not severe because the episodes recurred intermittently and did not last for the required 12 consecutive months

(Tr. 15).  The ALJ also found that the record established a diagnosis of HIV+, but this was a recent diagnosis (July 2011) with no objective evidence of AIDS or other HIV symptoms to establish this impairment as severe (Tr. 15-16).

The determination of "severity" at step two of the sequential evaluation process is guided by the regulations as follows:

> At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§§ 404.1509 and 416.909], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   To be medically determinable, an impairment:

> … must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms ….

20 C.F.R. §§ 404.1508, 416.908.  To be severe, an impairment must "significantly limit [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1521(a), 416.921(a), which are "the abilities and aptitudes necessary to do most jobs," such as:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> (2) Capacities for seeing, hearing, and speaking;
>
> (3) Understanding, carrying out, and remembering simple instructions;
>
> (4) Use of judgment;
>
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
>
> (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b).  In addition, the impairment or combination of impairments "must either last or be expected to last for a continuous period of at least 12 months" or be expected to result in death.  20 C.F.R. §§ 404.1509, 416.909; *see Whiteside v. Colvin*, 2014 WL 585303, at *8 (W.D.N.Y. Feb. 13, 2014).

Although the Second Circuit has held that the ALJ's function at the second step of the sequential evaluation is limited to "screen[ing] out *de minimis* claims," *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (citing *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe."  *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).  "Indeed, a finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Flagg*, 2013 WL 4504454, at *7 (quoting *Rosario v. Apfel*, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19,1999)); *see also* Social Security Ruling ("SSR") 85–28, 1985 WL 56856 at *3 (S.S.A. 1985), *quoted in Bowen*, 482 U.S. at 154 n. 12 (1987).

In this case, the ALJ's determination reveals a thorough consideration of the objective medical evidence, beginning with the records of plaintiff's treatment at Buffalo Medical Group ("BMG") from February 2004 through August 2011 (Tr. 282-325).  As the ALJ noted, plaintiff was initially seen at BMG by Dr. Stacy Silverman Ostrow on February 25, 2004, for skin lesions.  Physical examination revealed multiple depressed scars on his legs with hyperpigmentation.  Dr. Ostrow's impression was furunculosis and dermatitis of the face.  She prescribed skin ointment and hydrocortisone, and advised plaintiff to seek

primary care for health maintenance  (Tr. 317, 322-23).  He was seen again by Dr. Ostrow on April 15, 2004, to assess sudden sharp pain developing on his left side, which Dr. Ostrow diagnosed as herpes zoster, or shingles (Tr. 314).  At a follow-up appointment on April 22, 2004, Dr. Ostrow noted improvement on his prescribed medications Neurontin and Famvir, but plaintiff continued to report pain in the area of the shingles.  He was again advised to seek a primary care physician (Tr. 313).

On December 20, 2004, plaintiff saw Dr. Borys Loza at BMG for an initial primary care evaluation.  Plaintiff reported a history of shingles, controlled by Neurontin which he took intermittently.  Physical examination was unremarkable.  Dr. Loza's impression was PHN and health maintenance issues, and he renewed plaintiff's prescription for Neurontin (Tr. 311-12).

On January 12, 2005, plaintiff saw Dr. Paul Wirth at BMG for evaluation of his skin lesions, upon referral from Dr. Loza.  Plaintiff reported a history of dermatitis, furunculosis, and shingles, but Dr. Wirth noted that none of these conditions were presently active.  Physical examination of the lower extremities revealed a number of areas of diffuse postinflammatory hyperpigmentation, and several erythematous excoriated papulnodules, consistent with prurigo nodularis.  Dr. Wirth prescribed Topicort cream, and scheduled follow-up for one month (Tr. 224).  Plaintiff saw Dr. Wirth again on June 8, 2005, reporting an episode of shingles and continuous PHN for several months.  Examination revealed continued presence of postinflammatory hyperpigmentation, but his prurigo nodularis lesions had "improved quite nicely."  He was referred for pain management related to his PHN (Tr. 227).

The ALJ noted that on July 12, 2005, plaintiff saw Dr. Michael Pusatier at BMG after Dr. Loza had relocated to start a new practice. Dr. Pusatier reported that plaintiff had been diagnosed about eight months prior with shingles on the left side of his body, and associated neuropathy which was controlled by Neurontin. He stopped taking the medication when his prescription ran out, and the pain returned, so he came to BGH for a refill. He was otherwise healthy. Upon physical examination, Dr. Pusatier noted some obvious scars in the area of the posterior thoracic spine, but results were otherwise unremarkable. His assessment was PHN by history and elevated blood pressure. Dr. Pusatier refilled plaintiff's Neurontin prescription, and sent him for blood work prior to a health maintenance exam scheduled for October 2005 (Tr. 18-19, 244-45). The medical records reflect that plaintiff was seen at BMG for a health maintenance exam on October 26, 2005, but he had not had the blood work done (Tr. 19, 304).

As noted by the ALJ, plaintiff did not return to see Dr. Pusatier–or otherwise seek medical attention–until June 25, 2008, nearly three years after his last appointment. Dr. Pusatier reported plaintiff's history of intermittent PHN for the past three years, with intermittent use of Neurontin as needed. Comprehensive physical examination revealed negative findings except for PHN on the left flank, some weight loss, and sleep disturbance (Tr. 236-37). Plaintiff next saw Dr. Pusatier on March 18, 2009, reporting severe pain after he slipped on grass and twisted his back, as well as elevated blood pressure for the past three months (Tr. 234). Dr. Pusatier's assessment was lumbosacral strain and unspecified essential hypertension. He recommended heat and stretching to address back pain, along with regular exercise and weight loss with regard to blood pressure improvement (Tr. 235).

On May 1, 2009, plaintiff saw Dr. Pusatier for assessment of a gunshot wound suffered a week earlier.  Dr. Pusatier noted small entrance and exit wounds in the area of the left buttock and left hip, with antalgic gait (Tr. 251-52).  At a follow-up appointment on May 19, 2009, plaintiff reported continued left-sided buttock and hip pain, along with a cracked wisdom tooth.  He was walking with a cane.  Dr. Pusatier reviewed an x-ray of the hip taken on April 30, 2009, which was reported as within normal limits (Tr. 253-56).

Dr. Pusatier's treatment notes indicate that he saw plaintiff for a physical exam on December 8, 2009.  Plaintiff reported "no problems" (Tr. 259), and Dr. Pusatier noted that plaintiff's active problems (listed as PHN, benign essential tremor, and unspecified essential hypertension) had been reviewed, and were stable (*id.*).  Upon examination, Dr. Pusatier reported negative findings except for left buttock and PHN pain (Tr. 260).  His assessment was "Healthy male exam" (Tr. 261).  In his progress notes from the same encounter, Dr. Pusatier noted plaintiff's history of severe shingles, with six outbreaks over the past five years lasting from three to five weeks, and continued "knife-like stabbing" left side abdominal pain, reported as "worsening" (Tr. 257).  His diagnosis was PHN, with increased dosage of Gabapentin (generic for Neurontin) to control pain, and the following comment: "Agree with application for long term disability" (Tr. 258).  As indicated above, plaintiff's SSDI/SSI application was filed on December 3, 2009.

On February 18, 2010, Dr. Kathleen Kelley performed a consultative internal medicine examination at the request of the state agency reviewing plaintiff's SSDI/SSI application (Tr. 265-69).  As noted by the ALJ, plaintiff reported acute to severe residual leg pain and decreased range of motion, attributed to the gun shot wound nine months earlier and his eight-year history of chronic PHN.  He also reported three episodes of

-15-

shingles from 2000-03.  He complained of extreme leg pain if he did not take Gabapentin.

Examination revealed no acute distress, He had a slight limp favoring the left leg, and an

abnormal stance.  He could not walk heel to toe and had difficulty squatting.  He had some

limited range of motion in the lumbar spine and left knee, and positive findings on straight

leg raising, but strength was rated at 5 out of 5 in all extremities, and lumbosacral x-rays

showed no acute abnormalities.  Dr. Kelley's prognosis was "fair," and her medical source

opinion was stated as follows: "long standing, walking, climbing, squatting repetitively, and

crawling will all require comfort breaks.  Should be leery working around heights or heavy

equipment, Should have psych evaluation." (Tr. 268).

Plaintiff saw Dr. Pusatier on February 22, 2010, reporting a breakout of shingles

over the holidays, and joint pain.  Examination revealed healing eschar on the left chest

wall consistent with shingles, but otherwise unremarkable findings (Tr. 300-01).  On April

5, 2010, plaintiff reported sharp rib pain on the right side, assessed as a sprain and strain

(Tr. 298-99).  On May 25, 2010, Dr. Pusatier noted elevated hypertension and mildly

antalgic gait (Tr. 296-97).

Plaintiff did not see Dr. Pusatier again until March 21, 2011, when plaintiff reported

"back pain for years" and recurrent lesions from shingles on his right side, with severe right

side abdominal PHN pain (Tr. 292).  Findings upon physical exam were negative except

for back pain and right-sided abdominal PHN (Tr. 294-95).  On May 13, 2011, plaintiff

complained of a new episode of shingles on his left side, confirmed upon physical exam,

which plaintiff reported as his fifth episode in six years (Tr. 290-91).

On July 4, 2011, plaintiff saw Dr. Corstiaan Brass, an infectious disease specialist,

as a new patient.  Plaintiff reported that his shingles initially began in 2002, with several

recurrences, with the recent episode "becoming very incapacitating, such that it interferes with his ability to work" (Tr. 287).  Examination revealed evidence of a resolving shingles rash, but otherwise grossly normal findings.  Joint exam revealed  full range of motion of spine, shoulders, and extremities (Tr. 288).  At a follow-up visit on August 3, 2011, Dr. Brass reported that blood work showed a "CD4 count of 195 and positive HIV" (Tr. 282). He counseled plaintiff that "HIV at this point is a chronic disease, not a fatal disease or death sentence," and recommended further viral load testing and phenotyping, followed by retroviral therapy (*id.*; *see also* Tr. 327).  However, the record contains no report of any additional HIV screening or therapy, or any further reports of medical treatment subsequent to plaintiff's August 3, 2011 visit with Dr. Brass.

This review of the objective medical evidence confirms plaintiff's history of recurrent shingles and recent diagnosis of HIV infection, as determined by the ALJ.  However, the ALJ also found that these impairments were not of qualifying severity because the intermittent recurrences of shingles did not meet the duration requirement, and plaintiff's HIV infection was asymptomatic.

In this regard, examination of the detailed criteria for evaluating immune deficiency disorders under section 14.00 of the Listings reveals that a claimant with HIV infection may be found disabled under Listing 14.08 where there is documentation of the infection as described in 14.00(F),[5] and evidence of one of several listed conditions–including herpes

---

[5]Section 14.00(F) provides, in pertinent part:

The medical evidence must include documentation of HIV infection. Documentation may be by laboratory evidence or by other generally acceptable methods consistent with the prevailing state of medical knowledge and clinical practice. When you have had laboratory testing for HIV infection, we will make every reasonable effort to obtain reports of the

(continued...)

zoster, either "[d]isseminated … or … [w]ith multidermatomal eruptions that are resistant to treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.08(D)(3). As indicated above, plaintiff's HIV condition was diagnosed by Dr. Brass in August 2011, upon review of extensive blood work performed on July 18, 2011, which included an immunology study showing a CD4 count of 195,[6] and positive HIV screening (Tr. 282, 328). In addition, Dr. Brass had previously observed in his July 4, 2011 treatment notes that plaintiff's herpes zoster infection began in 2002 and had recurred several times during the following nine years, with evidence of apparent multidermatomal eruption and no known etiology (see Tr. 287).

In the court's view, these findings and observations should have triggered the ALJ's obligation under the Act and regulations, as recognized by well-settled Second Circuit case law, to "affirmatively develop the record in light of the essentially non-adversarial nature"

---

[5](...continued)
results of that testing.

…

If no definitive laboratory evidence is available, we may document HIV infection by the medical history, clinical and laboratory findings, and diagnosis(es) indicated in the medical evidence. For example, we will accept a diagnosis of HIV infection without definitive laboratory evidence of the HIV infection if you have an opportunistic disease that is predictive of a defect in cell-mediated immunity … and there is no other known cause of diminished resistance to that disease …. In such cases, we will make every reasonable effort to obtain full details of the history, medical findings, and results of testing.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00(F)(1), (F)(1)(b)

[6]Section 14.00(F)(2) states:

Generally, when the CD4 count is below 200/mm3 (or below 14 percent of the total lymphocyte count) the susceptibility to opportunistic infection is greatly increased. Although a reduced CD4 count alone does not establish a definitive diagnosis of HIV infection, a CD4 count below 200 does offer supportive evidence when there are clinical findings, but not a definitive diagnosis of an opportunistic infection(s).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00(F)(2).

of Social Security benefit determinations.  *Tejada*, 167 F.3d at 774; *see also Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d).  This obligation "includes assembling the claimant's complete medical history and recontacting the claimant's treating physician if the information received from the treating physician or other medical source is inadequate to determine whether the claimant is disabled …," as well as "advising the plaintiff of the importance of such evidence."  *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004); *see also King v. Astrue*, 2008 WL 821999, at *4 (W.D.N.Y. Mar. 26, 2008) ("When the evidence received from the treating physician is inadequate to determine whether a claimant is disabled, the ALJ is obligated to recontact the treating physician in an attempt to obtain additional evidence or clarification.") (citing 20 C.F.R. § 404.1512(e)).  Considering the diagnosis of plaintiff's positive HIV status as documented by definitive laboratory findings, and the substantial objective evidence and testimony regarding plaintiff's diminished resistance to recurrent episodes of herpes zoster with no etiology prior to the diagnosis, the ALJ should at the very least have made every reasonable effort to recontact Dr. Brass in order to obtain the results of the further HIV screening and other tests indicated in the record, or to otherwise obtain further details of the history and medical findings regarding plaintiff's HIV infection and any associated symptomatology.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 14.00(F)(1), (F)(1)(b) (cited in note 5, *infra*).

Furthermore, the record contains no medical source opinion or findings of fact regarding the extent to which plaintiff's shingles or HIV status limited his physical or mental ability to do basic work activities for twelve consecutive months at any time during the

claimed periods of disability for SSDI[7] or SSI[8] purposes, leaving an evidentiary gap in the record with respect to the showing required by the regulations cited above governing the Commissioner's determination of severity.  Under such circumstances, courts have ordered remand to allow the ALJ to contact the claimant's treating sources or other medical experts in order to obtain their opinions "on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals" any Listing criteria.   20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *see Haskins v. Astrue*, 2010 WL 3338742, at *7 (N.D.N.Y. Apr. 23, 2010) (remand to allow ALJ to recontact treating physicians "in an attempt to obtain their opinions of Plaintiff's ability to work during the relevant time period"); *Rosa*, 168 F.3d at 82–83 ("[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand "for further development of the evidence" is proper).

Based on this analysis, and upon review and consideration of the evidence in the record as a whole, the court finds that the ALJ's decision was based on an erroneous application of the legal standards governing discharge of the Commissioner's affirmative duty to fully and fairly develop the administrative record.  Accordingly, the Commissioner's determination cannot be upheld, and the matter must be remanded.

---

[7]Plaintiff's claimed period of disability for purposes of eligibility for SSDI benefits is from January 10, 2003, his alleged onset date, through December 31, 2003, the date on which he was last insured. Plaintiff acknowledges that there is no objective evidence of record pertaining to plaintiff's medical condition prior to the expiration of his insured status.

[8]Plaintiff's claimed period of disability for purposes of eligibility for SSI benefits is from December 1, 2009, the date on which he applied for SSI, through March 14, 2012, the date of the Commissioner's final decision.

## **CONCLUSION**

For the foregoing reasons, plaintiff's motion for judgment on the pleadings (Item 14) is granted, the Commissioner's motion for judgment on the pleadings (Item 11) is denied, and the matter is remanded to the Commissioner for further proceedings in accordance with this decision and pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of the Court is directed to enter judgment in favor of the plaintiff, and to close the case.

So ordered.

_____
JOHN T. CURTIN
United States District Judge

Dated:                              , 2015
p:\pending\2013\13-896.ssdi.ssi.apr22.2015